# In the United States Court of Federal Claims

|  |  |
|---|---|
| B.L. HARBERT INTERNATIONAL, LLC, | |
| *Plaintiff,* | |
| v. | No. 22-712C |
| THE UNITED STATES, | (Filed March 26, 2025) |
| *Defendant.* | |

Matthew W. Willis, Ashley & Arnold, Dyersburg, TN, for plaintiff.

Christopher A. Berridge, Civil Division, United States Department of Justice, Washington, DC, for defendant.

### OPINION AND ORDER
#### Granting the Government's Motion for Judgment on the Pleadings and Denying B.L. Harbert's Motion to Amend its Complaint

**SILFEN,** *Judge.*

The United States Army Corps of Engineers solicited offers to replace a taxiway at Joint Base Andrews in Maryland. The Corps awarded B.L. Harbert the contract. Harbert subcontracted out some of the work. It had subcontractors do the undercutting (that is, removing soil and rock and then replacing it to allow for pavement) and paving. The parties modified the contract a few times to address additional undercutting, adding to Harbert's compensation for that work. Harbert later sought more compensation based on the additional undercutting work and delays the work caused. The contracting officer denied Harbert's requests, and Harbert sued in this court under the Contract Disputes Act, 41 U.S.C. § 7104.

The government moves for judgment on the pleadings. Harbert opposes and requests that, if the court finds the complaint insufficient, the court permit Harbert to amend its complaint.

Harbert was compensated for the additional work that it performed, which was work the Corps requested. In each contract modification, Harbert waived its right to seek additional compensation beyond what the parties agreed to. Harbert does not provide any additional facts that could cure those deficiencies in its complaint. This court will therefore grant the government's motion for judgment on the pleadings and deny Harbert's motion to amend its complaint because the proposed amendment would be futile.

## I.      Background

In 2016, the Corps issued a solicitation for a multiple-award task-order contract for construction services. ECF No. 21-1 at 59-62. In other words, multiple contractors would be admitted under the contract, and they could later bid on task orders for specific projects. In early 2017, the Corps notified Harbert that it was one of the contract awardees. *Id*. at 61. The Corps then asked its awardees for task order proposals to repair and replace a taxiway at Joint Base Andrews. *Id*. at 96-97. Harbert bid, and the Corps awarded it the taxiway contract. *Id*. at 207. The first phase of the taxiway contract—the only phase relevant to this case—included removing and replacing soil and rock below the taxiway, known as undercutting, and then repaving the taxiway. *Id* at 124.

Harbert subcontracted the undercutting work to Allen Myers and the paving work to RC Construction. ECF No. 21-1 at 123-26. Before RC Construction could begin paving, Allen Myers had to complete the undercutting. *Id*. at 126. Based on the volume of undercutting specified in the contract—described in cubic yards of soil and rock removed—Harbert established a schedule with its subcontractors. *Id*. at 128. The undercutting and paving work was scheduled to be completed in October 2018. *Id*.

In July 2018, after the undercutting work began, it became apparent that more soil and rock needed to be undercut. ECF No. 21-1 at 151. Harbert and its subcontractors stopped performing

after they had removed the volume of soil and rock agreed upon in the contract, and Harbert requested a contract modification to pay for the additional work. *Id*. at 151. The Corps unilaterally modified the contract to pay for more undercutting—an additional 5,000 cubic yards of material for an additional $496,197—in a modification known as A3. *Id*. at 154, 208. Under the unilateral modification, the Corps gave Harbert the opportunity to negotiate for more compensation. ECF No. 21-1 at 5. The modification stated that "[c]hanges in the contract performance time, if any, will be provided in a subsequent modification. A full time impact analysis will be reviewed during the supplemental negotiations for full and final settlement of this change." *Id*. Harbert went back to undercutting.

In August, the Corps and Harbert began negotiating to convert the A3 unilateral modification to a bilateral modification, known as P2. ECF No. 21-1 at 157-59. The bilateral modification added still more undercutting, added $359,303 in pay (instead of the total in the unilateral modification), and extended the deadline for the first phase by two months to December 21, 2018. *Id*. at 158. The extension did not impact the overall project schedule because the next phase would not begin until several months later. *Id*. The bilateral modification also contained a waiver, stating that the modification "constitutes compensation in full on behalf of the Contractor and its Subcontractors and Suppliers for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated." *Id*.

In September 2018, Harbert again noted that it would need to undercut more soil and rocks, beyond the scope of the earlier P2 modification. ECF No. 21-1 at 161-62. The Corps agreed and issued another unilateral modification, A4, increasing the contract value by $458,950. *Id*. In October, Harbert completed the undercutting work approved by the A4 modification, but the site still

required more undercutting. *Id*. at 183. Harbert notified the Corps and requested approval to continue to work. *Id*. at 227. The Corps again approved the additional undercutting, and the parties signed another bilateral modification, P3, further increasing the undercutting quantity and increasing the pay. *Id*. at 165. The P3 modification, like P2, contained a waiver. It "reflect[ed] all credits due the Government and all debits due" Harbert or its subcontractors, except, unlike P2, it allowed Harbert to seek compensation for "any time extension due to the changed work, and resulting increased costs." *Id*. The waiver further released the government "from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to the proposals for adjustment except for any time extension due to the changed work and resulting increased cost." *Id.* The P3 modification did not alter the scheduled completion date, which remained December 21, 2018. *Id*.

Later, the Corps and Harbert agreed to a third bilateral modification, known as A5, for weather delays between June and September 2018. ECF No. 21-1 at 168-70. The modification was non-compensable—that is, it did not increase the pay—extended the phase 1 completion date by ten days, and again did not impact the overall project completion date. *Id*. Harbert and its subcontractors completed phase 1 on December 19, 2018, twelve days before the new deadline. *Id*. at 194.

In October 2019, Harbert sent the Corps a request for an equitable adjustment to cover the expenses its paving subcontractor, RC Construction, incurred while waiting for the undercutting work to be completed. ECF No. 21-1 at 122. RC Construction was originally scheduled to work between July and October, but due to the additional undercutting, RC Construction did not begin until August 8; it finished on December 19. Harbert argued to the Corps that the additional undercutting increased RC Construction's period of performance by 34 days, which resulted in $2.25 million of additional compensable costs. *Id*. at 193-94. The Corps denied Harbert's request for

4

equitable adjustment, noting that the bilateral modifications waived compensation for any addi-tional costs for the contractor and its subcontractors. *Id*. at 174.

In February 2021, Harbert submitted a certified claim to the contracting officer for RC Construction's additional time and costs that were not compensated by the P3 modification. ECF No. 21-1 at 183-204. The contracting officer issued a final decision in June 2021 denying Harbert's claim. *Id*. at 206-11. Harbert timely sought review of the contracting officer's decision in this court. ECF No. 1 at 2 [¶4]; *see* 41 U.S.C. § 7104(b)(1), (4).

## II.    Discussion

The government moves for judgment on the pleadings, arguing that it does not owe Harbert any more compensation because (1) the contract modifications already compensated Harbert for the differences between the actual site conditions and those known at the time of the contract; (2) Harbert waived its right to bring suit on the claims for which it already received payment; and (3) Harbert's complaint does not sufficiently allege its breach-of-contract theories. *See* ECF No. 21.

This court's jurisdiction is primarily defined by the Tucker Act, which provides the court with exclusive jurisdiction to decide specific types of monetary claims against the United States. *Kanemoto v. Reno*, 41 F.3d 641, 644 (Fed. Cir. 1994); 28 U.S.C. § 1491(a)(1). The Contract Dis-putes Act, Pub. L. No. 95-563, 92 Stat. 2383 (1978), amended the Tucker Act and gives the court "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 ... on which a decision of the contracting officer has been issued." 28 U.S.C. § 1491(a)(2).

"[A]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Rules of the Court of Federal Claims (RCFC), Rule 12(c). Judg-ment on the pleadings is appropriate when "there are no material facts in dispute and the party is

entitled to judgment as a matter of law." *Forest Laboratories, Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007).

The court applies the same standard it applies to a motion to dismiss for failure to state a claim under the court's rule 12(b)(6). *Jordan v. United States*, 119 Fed. Cl. 694, 697 (2015). A complaint should be dismissed under rule 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). To avoid dismissal, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court will accept well-pleaded factual allegations as true and draw all reasonable inferences in the claimant's favor. *Lindsay*, 295 F.3d at 1257. A "plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014).

### A.    Harbert waived any claims for additional compensation when it agreed to the bilateral contract modifications

Harbert's complaint alleges that the Corps's solicitation underestimated the site conditions and the work required for the project. ECF No. 1 at 5-6 [¶¶25-35]. According to the complaint, Harbert relied on the solicitation to set its original schedule for phase 1; Harbert and its subcontractors were harmed when they had to do more undercutting, which took longer than the work described in the solicitation. *Id*. The government argues that the negotiated contract modifications bar Harbert's claims. According to the government, the contract modifications fully compensated Harbert, and in those agreements Harbert waived any additional compensation. ECF No. 21 at 20-29.

The record is clear (*see supra* part I) and the parties agree (ECF No. 21; ECF No. 29 at 14-15) that the negotiated bilateral contract modifications compensated Harbert for additional work it

6

performed based on the actual site conditions differing from those described in the solicitation. The parties disagree on whether Harbert may seek additional compensation for its extra standby time and accelerated schedule, both caused by those differing site conditions.

Harbert argues that, when it agreed to bilateral modifications P2 and P3, it understood that it could later request equitable adjustment for the additional costs that RC Construction incurred based on the extension of time. ECF No. 29 at 17 (citing ECF No. 21-1 at 167). The extension of time meant paying for more of RC Construction's downtime. According to Harbert, its own actions demonstrate that there was no meeting of the minds on a waiver that would prevent it from seeking additional costs for that downtime. *Id.* Harbert also argues that, before the parties signed the P3 modification, Harbert notified the government that it intended to seek an equitable adjustment. *Id*. at 17-18 (citing ECF No. 29-1 at 1). The government responds that Harbert was fully compensated, that Harbert's waiver is unambiguous, and that the language of the contract, not external communications between the parties, controls the interpretation of the contract. ECF No. 31 at 3-7.

Harbert's claims related to the first bilateral modification, P2, are barred. The P2 modification included a two-month extension to complete both the undercutting and paving, extending the deadline to December 21, 2018. The modification stated that Harbert and its subcontractors waived the right to seek compensation for any delays related to the additional undercutting. ECF No. 21-1 at 158. The government was paying "in full on behalf of the Contractor and its Subcontractors and Suppliers for all costs and markups directly or indirectly attributable for the change ordered, for all delays related thereto, for all extended overhead costs, and for performance of the change within the time frame stated." *Id*. When a contractor signs a general release, it is barred from seeking damages for the events connected to and contemplated by the release. *See Clark Mechanical Contractors, Inc. v. United States*, 5 Cl. Ct. 84, 86 (1984) ("[T]he execution by a contractor of a release which is complete on its face reflects the contractor's unqualified acceptance and

7

agreement with its terms and is binding on both parties."); *Dairyland Power Co-op. v. United States*, 27 Fed. Cl. 805, 811 (1993) ("If a contractor wishes to preserve a right to assert a claim under that contract later, it bears the burden to modify the release, before signing it."). To the extent that Harbert's allegations are related to the additional work covered by the P2 modification, Harbert waived those claims.

Harbert's claims related to the second bilateral modification, P3, are also barred. Unlike P2, the P3 modification did not extend the completion date. The P3 modification's additional pay "reflects all credits due the Government and all debits due the Contractor, except for any time extension due to the changed work, and resulting increased cost." ECF No. 21-1 at 165. The modification left open the question of increased costs because of time extensions; it allowed Harbert to pursue those costs later if the additional work resulted in a "time extension." *Id*. The record shows that the parties were uncertain if the additional work would result in delays; Harbert wrote to the Corps that it "anticipates that the extension of time resulting from this Change Order will result in winter weather disruptions to temperature-sensitive work activities." ECF No. 21-1 at 167.

Rather than taking a time extension, Harbert chose to have its subcontractor, RC Construction, accelerate the paving work. ECF No. 1 at 4-5 [¶22]. Harbert and its subcontractors completed both the undercutting and paving work two days ahead of the schedule that was set in the P2 modification, unchanged in the P3 modification, and shifted an additional ten days back in the later A5 modification, such that the contracted work was finished twelve days early. ECF No. 21-1 at 8-9. That acceleration resulted in additional costs for RC Construction, which brought in more equipment and labor to complete the job faster. ECF No. 1 at 4-5 [¶22]. Harbert alleges that it is entitled to compensation for its decision to accelerate the work. But that acceleration is not a time extension; it is an increased cost reflected in the P3 modification. And while Harbert sent the Corps

a letter after the P3 modification noting that extension-of-time costs are available (ECF No. 21-1 at 167), Harbert took no further extensions of time in connection with the P3 modification. Harbert could have negotiated with the Corps to cover acceleration costs that would prevent any further extensions of time, but it is too late to make that change to the contract after the fact. *Clark*, 5 Cl. Ct. at 86 ("A contractor [is precluded] from maintaining a suit based on events which occurred prior to the execution of the release."). Because the P3 modification provided consideration for Harbert's costs associated with the additional work, other than time extensions, and Harbert did not need a second time extension, Harbert does not state a claim on which this court can grant relief.

Harbert also argues that the P2 and P3 contract modifications do not limit its claims here because the parties understood that each modification and waiver did not cover Harbert's additional costs. ECF No. 29 at 16-18. Harbert notes that it sent two letters to the government: one before modification A3 (ECF No. 29-1 at 1), which preceded P2, and another before modification P3 (ECF No. 21-1 at 167). According to Harbert, both letters demonstrate Harbert's understanding of what the modifications covered, and both reserved the right to seek compensation for other costs. ECF No. 29 at 16-18. According to Harbert, either the Corps accepted those conditions when it executed the agreements, or it knew the executed agreements did not represent a meeting of the minds. *Id.* at 18-19. The government argues that Harbert's concerns were incorporated into the executed contracts, and the language of the contracts, not extracontractual documents, controls. ECF No. 31 at 3-6.

As an initial matter, when contract provisions are "clear and unambiguous, they must be given their plain and ordinary meaning." *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993). If a provision is clear and unambiguous, the court may not resort to extrinsic evidence to read ambiguity into the contract terms. *McAbee Construction, Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996); *see Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183

(Fed. Cir. 1988) ("[E]xtrinsic evidence will not be received to change the terms of a contract that is clear on its face."). P3 is clear and unambiguous: Harbert received compensation for all work except in the case of further delays. ECF No. 21-1 at 165. Thus the court may not consider extrinsic evidence like Harbert's pre-modification letters.

Harbert also asks the court to declare the contract modifications invalid because of a mutual mistake of fact and to reform the contract. ECF No. 29 at 17-19. Harbert's complaint does not raise the issue of mutual mistake. *See* ECF No. 1. Even if Harbert's complaint had raised the issue, under the Contract Disputes Act, this court has jurisdiction over "actions brought on claims within twelve months of a contracting officer's final decision." *James M. Ellett Construction Co. v. United States*, 93 F.3d 1537, 1541 (Fed. Cir. 1996). This court may review only claims presented to and certified by a contracting officer. *K-Con Building Systems, Inc. v. United States*, 778 F.3d 1000, 1005 (Fed. Cir. 2015). Harbert did not present its request for contract reformation due to mutual mistake of fact to the contracting officer (*see* ECF No. 21-1 at 186-204). *K-Con*, 778 F.3d at 1006 ("[P]resenting a materially different factual or legal theory … create[s] a different claim.").

Regardless, Harbert does not meet the factual threshold for pleading mutual mistake. To show a mutual mistake, Harbert must meet four elements by clear and convincing evidence, including demonstrating that "the parties to the contract were mistaken in their belief regarding a fact … [and] the contract did not put the risk of the mistake on the party seeking reformation." *Lakeshore Engineering Services, Inc. v. United States*, 748 F.3d 1341, 1350 (Fed. Cir. 2014); *see Philippine Sugar Estates Development Co. v. Government of Philippine Islands*, 247 U.S. 385, 393 (1918).

Harbert and the Corps may have had different understandings of what was included in the waiver, but, to allege a mutual mistake, Harbert must show that the parties *shared* a mutual

mistake. *See generally, e.g., Bowen–McLaughlin–York Co. v. United States*, 813 F.2d 1221 (Fed. Cir. 1987) (granting contract reformation when the parties both erroneously omitted certain price items that existed and could have been included in the contract); *Southwest Welding & Manufacturing Co. v. United States*, 373 F.2d 982, 990 (Ct. Cl. 1967) (finding a mutual mistake when the parties both mistakenly believed the price of steel was lower than it actually was); *Walsh v. United States*, 102 F. Supp. 589 (Ct. Cl. 1952) (finding a mutual mistake when the parties both erroneously believed the minimum wage rate was lower than it was).

Here, Harbert's first letter to the government (ECF No. 29-1 at 1) does not show a mutual mistake because the later modifications incorporated Harbert's concerns. That incorporation shows the Corps's understanding of Harbert's letter. After receiving Harbert's first letter, the government issued unilateral modification A3, which stated, "It is understood that this adjustment may not constitute full and final settlement for this modification …. Upon completion of negotiations, a supplemental agreement will be issued to reflect full and final settlement." ECF No. 21-1 at 162. Similarly, Harbert's second letter, before executing P3, stated that there were additional costs associated with "extension of time and reduced production due to this Change Order." ECF No. 21-1 at 167. As already discussed, the negotiated P3 modification included a carveout specifically for time extensions, and P3 is clear on its face that the government compensated Harbert for the extra work Harbert had to do within the agreed timeframe. P3 is also clear that Harbert waived any claim resulting from anything but a time extension. Harbert did not do work outside the contractual timeframe or request additional time extensions. Thus, mutual mistake of fact would not provide a basis for changing the terms of the contract.

**B.    Harbert has not sufficiently alleged that the government breached the contract**

Harbert alleges that the government breached its duty to cooperate and withheld superior knowledge, which resulted in a constructive change to the contract. ECF No 1 at 6-7 [¶¶36-43].

As discussed, the Corps compensated Harbert for the unexpected site conditions it encountered as it executed the contract. Harbert's complaint does not allege any Corps action that hindered Harbert's performance, nor does Harbert identify any superior knowledge it believes the Corps withheld.

> **1.     Harbert's complaint does not identify any action the Corps took to breach the duty to cooperate**

Harbert alleges that the Corps breached the duty to cooperate by withholding vital information that prevented, hindered, delayed, or disrupted Harbert's contract performance. ECF No 1 at 6 [¶¶36-39].

The duty to cooperate is an aspect of the duty of good faith and fair dealing, which is an inherent covenant present in all contracts. Restatement (Second) of Contracts § 205; *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 820 n.1 (Fed. Cir. 2010). The duty requires a party "to not interfere with another party's rights under the contract." *Precision Pine*, 596 F.3d at 828. A claim for a breach of the covenant of good faith and fair dealing is "limited to assuring compliance with the express terms of the contract and can not be extended to create obligations not contemplated in the contract." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019), *cert denied*, 140 S. Ct. 1106 (2020) (cleaned up). To successfully allege a breach, the contractor must show that the government either did not take an action that was essential for the contractor to be able to perform or took an action that hindered or delayed the contractor's performance. *Ryco Construction, Inc. v. United States*, 55 Fed. Cl. 184, 192 (2002); *CEMS, Inc. v. United States*, 59 Fed. Cl. 168, 195 (2003).

Here, Harbert does not allege any specific action that the Corps took to prevent Harbert from performing its duties under the contract. *See generally* ECF No. 1. Harbert's complaint instead states that the "Corps breached this duty through its actions, inactions, and failures, and the

Plaintiff and its subcontractor RC were damaged." ECF No 1 at 6 [¶39]. Harbert's response to the government's motion likewise states in full that "the proper elements of each claim have been pled, and sufficient facts to support the plausibility of each claim have been pled." ECF No. 29 at 22. The allegations appear to be again that the Corps did not tell Harbert that more undercutting would be needed. But as discussed, the Corps compensated Harbert each time Harbert identified additional undercutting that needed to be performed, and Harbert does not allege that it was unable to perform any aspect of the contract because of the Corps's actions. Thus, Harbert's claim for breach of the duty to cooperate does not rise above speculation and must be dismissed. *Twombly*, 550 U.S. at 555.

### 2. Harbert's complaint does not identify that the Corps withheld any superior knowledge

Harbert alleges that the Corps had superior knowledge and failed to disclose vital information regarding the scope of anticipated work during the bidding process. ECF No. 1 at 7 [¶¶40-43]. According to Harbert, the Corps's withholding that vital information was a constructive change to the contract, which resulted in Harbert's subcontractor's incurring additional costs. *Id.*

The superior knowledge doctrine "imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000). In its complaint, the contractor must allege four elements: that "(1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information." *Scott Timber Co. v. United States*, 692 F.3d 1365, 1373 (Fed. Cir. 2012) (quotation marks omitted).

Harbert does not sufficiently allege that the Corps withheld superior knowledge or constructively changed the contract. Harbert's complaint states that the "Corps had superior knowledge of, among other things, the potential need for additional undercut." ECF No. 1 at 7 [¶42]. Harbert's complaint does not include facts that show any of the four elements of a superior knowledge claim. And even if the Corps had been aware that the contractor would need to perform undercutting beyond what was included in the solicitation, Harbert cannot show that the additional work was a constructive change to the contract, when Harbert was compensated for the additional undercutting. *See Agility Defense & Government Services, Inc. v. United States*, 115 Fed. Cl. 247, 251 (2014) (explaining a constructive change does not occur when the parties negotiate changes to the contract). Harbert requests discovery to learn what superior knowledge the Corps had (ECF No. 29 at 22), but, like Harbert's claim for breach of the duty to cooperate, Harbert's superior knowledge does not rise above speculation and must be dismissed. *Twombly*, 550 U.S. at 555.

### C.     Amending the pleadings would be futile.

Harbert asks to amend its complaint, should the court find its factual allegations insufficient. ECF No. 29 at 15-16. A plaintiff may amend its complaint in response to a rule 12(c) motion only with "the court's leave," which should be "freely give[n] when justice so requires." RCFC 15(a)(2). If the court determines that an amendment would be futile, though, the court should deny the motion. *Foman v. Davis*, 371 U.S. 178, 182 (1962). "A proposed amendment is futile if it would not survive a motion to dismiss." *Marchena v. United States*, 128 Fed. Cl. 326, 330 (2016), *aff'd*, 702 F. App'x 988 (Fed. Cir. 2017). The party seeking to amend its complaint at this stage "must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion." *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1355 (Fed. Cir. 2006).

Harbert's motion does not contain any additional facts that it proposes to add to the complaint to cure any of the complaint's deficiencies, nor does Harbert provide a proposed amended complaint. Instead, Harbert argues that the government will not suffer prejudice if the court allows the amendment. ECF No. 29 at 15-16. But a lack of prejudice alone is not sufficient. Harbert must also show that its amended complaint makes up for the deficiencies of the existing complaint, such that the amended complaint could survive a dispositive motion. *Kemin Foods*, 464 F.3d at 1354-55 ("When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted, and it must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion."). For the reasons explained above, Harbert negotiated and received consideration for additional work, waived its right to seek additional compensation for that work, and did not take any time extensions for which compensation could have been available. There are no facts that Harbert proposes to add to its complaint that could overcome the undisputed facts of the case. Thus, allowing Harbert to amend its complaint would be futile.

## III.    Conclusion

The government's motion for judgment on the pleadings (ECF No. 21) is **granted**, and Harbert's motion to amend (ECF No. 28) is **denied**. The complaint is dismissed. The clerk of the court shall enter judgment.

**IT IS SO ORDERED.**


 s/ Molly R. Silfen
MOLLY R. SILFEN
Judge